**UNITED STATES DISTRICT COURT**   **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:12-CR-80(1) |
| | § | |
| DIETRICK LEWIS JOHNSON | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Dietrick Lewis Johnson's ("Johnson") Emergency Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (#194) wherein Johnson seeks compassionate release for the third time. The Government filed a response in opposition to the motion (#197). Johnson filed a Reply to the Government's response (#199). United States Probation and Pretrial Services ("Probation") supplemented its prior investigations and recommends that the court deny Johnson's third motion for compassionate release. Having considered the pending motion, the Government's response, Johnson's reply, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

Johnson's offense of conviction is summarized, as follows:

In early 2011, Johnson met a woman—the victim—on an Internet dating website. After the victim ended the relationship in December 2011, Johnson began stalking the victim by going to her residence and her place of employment. Johnson repeatedly contacted her by phone and text. Johnson was warned by the police on numerous occasions to stay away from the victim. From December 18, 2011, to January 16, 2012, the victim called the police ten times to report that Johnson was harassing her.

The victim subsequently installed video equipment on the exterior of her home. On January 28, 2012, Johnson was observed in her backyard with a flashlight, attempting to enter her garage. The police were called, and Johnson was located

approximately one block from the victim's residence. Johnson admitted to being in the victim's backyard and was arrested. Johnson was charged with Third Degree Stalking, and an Emergency Protective Order was issued, ordering Johnson to stay away from the victim.

On March 21, 2012, at approximately 6:45 a.m., Johnson went to the victim's place of employment. As the victim exited her vehicle, Johnson grabbed her at gunpoint, forcing her into the passenger's seat as he drove away in her car. Johnson forced the victim to call her boss to say she would not be coming to work. Thereafter, Johnson drove to a nearby parking lot to retrieve his vehicle and forced the victim to get into his car. Johnson drove them to his apartment where he instructed the victim to call the District Attorney's Office to drop the charges. Johnson further told the victim to call his mother and inform her that the charges had been dismissed and that Johnson and the victim were reconciling. Fearing for her life, the victim gave into Johnson's demands for sex. Johnson raped the victim, who suffered serious bodily injury. Eventually, Johnson took the victim back to her vehicle. Johnson was arrested on March 27, 2012, at his apartment, and a search of his vehicle revealed a loaded firearm.

On April 12, 2012, a grand jury in the Eastern District of Texas, Sherman Division, returned a three-count Indictment against Johnson in Cause No. 4:12-CR-80 in which he was charged in Count One with Carjacking, in violation of 18 U.S.C. § 2119; in Count Two with Possession of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and in Count Three with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). On August 7, 2012, Johnson pleaded guilty to Count One of Cause No. 4:12-CR-80 and agreed to a 240-month term of imprisonment pursuant to a binding plea agreement. The statutory maximum for this offense was 25 years' imprisonment (300 months).

While in custody, Johnson's outgoing mail was intercepted. Johnson asked a family member to send a firearm through the mail to another inmate who was going to kill the victim. Johnson was subsequently interviewed by law enforcement and acknowledged he wrote the letters. Johnson admitted that he asked his cousin to send a gun to a fellow inmate who was willing to "take care of Johnson's problem." Based on Johnson's conduct, he was indicted in Cause No.

2

4me

4:13-CR-88 for Tampering with a Witness, Victim, or Informant, in violation of 18 U.S.C. § 1512(a)(2)(A).  On October 15, 2013, Johnson pleaded guilty in Cause No. 4:13-CR-88 pursuant to a Rule 11(c)(1)(C) plea agreement that called for a 125-month term of imprisonment, which would run consecutively to his term of imprisonment in Cause No. 4:12-CR-80.

On November 15, 2013, Johnson was sentenced to a 365-month term of imprisonment, consisting of 240 months' imprisonment for Cause No. 4:12-CR-80 and 125 months' imprisonment for Cause No. 4:13-CR-88, such terms to run consecutively to one another, 5 years' supervised release, and a special assessment of $100.00.  In June 2015, Cause No. 4:13-CR-88 was dismissed and the 125-month sentence vacated because the Indictment was returned after the grand jury's term had expired.  A Second Amended Judgment (#201) was entered on December 12, 2025, clarifying that Johnson was sentenced in Cause No. 4:12-CR-80 to a term of 240 months' imprisonment, followed by 5 years of supervised release, to run concurrently with certain state sentences previously imposed in Collin County and Dallas County, Texas.  Johnson's 240-month term of imprisonment in Cause No. 4:12-CR-80 remains in force today.  Johnson is now housed at Federal Correctional Institution Butner Medium II ("FCI Butner Medium II"), located in Butner, North Carolina, with a projected release date of December 27, 2030.

On July 21, 2020, Johnson filed his original motion for compassionate release (#142), which the court denied on September 2, 2020 (#144).  On August 17, 2021, Johnson filed a second pro se request for compassionate release and motion for appointment of counsel (#158), which the court denied on September 29, 2021 (#168).  In his current "Emergency Motion" (#194), Johnson again requests the appointment of counsel to represent him and raises a number of medical conditions and other issues that he contends entitle him to compassionate release.  He claims that

he presents "extraordinary and compelling reasons" for compassionate release due to his age, length of time served, changes in the law, unusually harsh prison conditions, programming, U.S.S.G. § 1B1.13(b)(5), rehabilitation, and end-of-life medical issues as set forth in the separate suggestions filed in support of his motion. His medical complaints listed in a document entitled "Defendant's Suggestions in Support of an Emergency Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)" (#194-1) include metastatic bladder cancer, diabetes mellitus (Type II), obesity, hiatal hernia, the use of a walker for mobility, vertigo, cataracts, and inadequate medical care in prison. He also claims that he is eligible for compassionate release under the "catchall provision" of U.S.S.G. § 1B1.13(b)(5) and further qualifies due to the length of his sentence, his allegedly unusually harsh prison conditions, his rehabilitation, and his purportedly no longer posing a danger to society.

In his reply brief, Johnson reiterates many of the same arguments and suggests that he exhausted his administrative remedies with respect to maladies that were merely mentioned as part of his medical records but that he did not specifically bring to the attention of the warden. His contentions are not cognizable under the exhaustion doctrine nor are they properly raised in his reply brief. The United States Court of Appeals for the Fifth Circuit has repeatedly held that claims or arguments raised for the first time in a reply brief should not be considered by the court. *See United States v. Ramirez*, No. 25-50109, 2025 WL 3555129, at *1 (5th Cir. Dec. 11, 2025); *United States v. Barrera Rivera*, No. 25-40047, 2025 WL 3527439, at *2 (5th Cir. Dec. 9, 2025); *Conway v. United States*, 647 F.3d 228, 237 n.8 (5th Cir. 2011); *United States v. Rodriguez*, 602 F.3d 346, 360-61 (5th Cir. 2010). The Fifth Circuit has also consistently applied this position in the context of motions for compassionate release. *See United States v. Jurdi*, No. 24-40281, 2025

WL 1000165, at *1 (5th Cir. Apr. 3, 2025); *United States v. Zuniga Hernandes*, No. 22-50796, 2023 WL 3267856, at *1 (5th Cir. May 5, 2023); *United States v. Cogdell*, 855 F. App'x 976, 977 (5th Cir. 2021).

II.    Appointment of Counsel

Johnson requests the appointment of counsel to assist him in filing his third motion for compassionate release under 18 U.S.C. § 3582(c). There is no constitutional right to appointed counsel in post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."); *see Garza v. Idaho*, 586 U.S. 232, 245-46 (2019); *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991); *Albarran v. White*, No. 24-2758, 2025 WL 1625537, at *1 (9th Cir. June 9, 2025); *United States v. Jones*, No. 24-11675, 2025 WL 733234, at *2 (11th Cir. Mar. 7, 2025); *Pettis v. United States*, 129 F.4th 1057, 1063 (7th Cir. 2025) ("There is no constitutional right to counsel in postconviction proceedings."); *Tong v. Lumpkin*, 90 F.4th 857, 863 n.2 (5th Cir. 2024); *United States v. Manso-Zamora*, 991 F.3d 694, 696 (6th Cir. 2021) (finding that "every federal court of appeals to address the issue has agreed that there is no constitutional (or statutory) right to appointed counsel in § 3582(c) proceedings"); *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017). Specifically, the Supreme Court of the United States has stated:

> Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals. We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, *a fortiori*, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process.

*Finley*, 481 U.S. at 555 (internal citations omitted).

The court may, however, in the interest of justice, appoint counsel to assist a defendant in the pursuit of post-conviction relief where a defendant has raised nonfrivolous claims with factually and/or legally complex issues. *See United States v. Whitebird*, 55 F.3d 1007, 1011 (5th Cir. 1995) ("After [a defendant's first appeal], the decision whether to appoint counsel rests in the discretion of the district court."); *accord United States v. Garza*, No. 24-40425, 2025 WL 429978, at *1 (5th Cir. Feb. 7, 2025); *United States v. Hereford*, 385 F. App'x 366, 368 (5th Cir. 2010).

> The exercise of discretion in this area is guided . . . by certain basic principles. When applying this standard and exercising its discretion in this field, the court should determine both whether the petition presents significant legal issues, and if the appointment of counsel will benefit the petitioner and the court in addressing this claim.

*United States v. Molina-Flores*, No. 3:16-CR-130-N (19), 2018 WL 10050316, at *2 (N.D. Tex. Feb. 13, 2018) (quoting *Jackson v. Coleman*, No. 3:11-cv-1837, 2012 WL 4504485, at *4 (M.D. Pa. Oct. 2, 2012)); *see Scoggins v. MacEachern*, No. 04-10814-PBS, 2010 WL 3169416, at *1 (D. Mass. Aug. 10, 2010) ("In order to obtain appointed counsel, 'an indigent litigant must demonstrate exceptional circumstances in his or her case to justify the appointment of counsel.' The rare cases warranting appointment of counsel in the interests of justice typically involve nonfrivolous claims with factually and/or legally complex issues and a petitioner who is severely hampered in his ability to investigate the facts." (quoting *Cookish v. Cunningham*, 787 F.2d 1, 2 (1st Cir. 1986))).

Johnson is not entitled to the appointment of counsel to assist him with seeking compassionate release under 18 U.S.C. § 3582. *See Finley*, 481 U.S. at 555; *Whitebird*, 55 F.3d at 1010-11 (declining to recognize constitutional or statutory right to assistance of counsel in

bringing § 3582(c)(2) motion for sentence reduction); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("There is no right to counsel in § 3582 or other post-appellate criminal proceedings."). Moreover, Johnson provides no basis for the court to conclude that the appointment of counsel would benefit him or the court in addressing his claims. A motion "for compassionate release is not particularly complex factually or legally." *United States v. Drayton*, No. 10-200018, 2020 WL 2572402, at *1 (D. Kan. May 21, 2020); *see United States v. Wilfred*, No. 07-351, 2020 WL 4698993, at *1 (E.D. La. Aug. 13, 2020). In this situation, he has failed to raise any potentially viable claims or any factually or legally complex issues that could arguably justify the appointment of post-conviction counsel. Johnson is 60 years old and there is no indication that he is mentally or physically impaired such that he is unable to proceed *pro se* in this matter. He has previously filed numerous motions *pro se* both in this court and in the United States Court of Appeals for the Fifth Circuit, including two prior motions for compassionate release and scores of motions challenging his conviction and sentence in this case. Thus, the court finds that the discretionary appointment of counsel is not warranted. *See* 18 U.S.C. § 3006A(a)(2) (allowing appointment of counsel under certain circumstances when "the court determines that the interests of justice so require"). Accordingly, Johnson's motion for appointment of counsel is denied.

III.    Analysis

    A.    Controlling Law

    A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *accord Freeman v. United*

*States*, 564 U.S. 522, 526 (2011); *see* 18 U.S.C. § 3582(c).  Section 3582(c)(1)(A) embodies a rare exception to a conviction's finality.  This statute gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment.  The First Step Act of 2018 ("the Act"), Pub. L. No. 115-391, 132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

> (A) the court, upon motion of the Director of the Bureau of Prisons [("BOP")], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a)[1] to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions and policy statements; any pertinent policy statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jean*, 108 F.4th 275, 278 (5th Cir. 2024), *abrogated on other grounds by United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025); *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the United States Court of Appeals for the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances

that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b).  These categories are:

   (1)      the medical circumstances of the defendant;

   (2)      the age of the defendant;

   (3)      the family circumstances of the defendant;

   (4)      whether the defendant was a victim of abuse while in custody;

   (5)      other reasons similar in gravity to those previously described; and

   (6)      an unusually long sentence.

*Id*. § 1B1.13(b)(1)-(6).

As a result, a prisoner seeking compassionate release or a sentence reduction on his own motion must satisfy the following hurdles:

   (1)      the defendant must have exhausted his administrative remedies;

   (2)      "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii);

   (3)      the reduction must be consistent with the Commission's applicable policy statements; and

   (4)      the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors.

*Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022); *see Austin*, 125 F.4th at 692.

   B.      Exhaustion of Administrative Remedies

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release or sentence reduction unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United*

*States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional, but that it *is* mandatory"). The exhaustion requirement applies whether the motion is styled as one for compassionate release or merely for a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A). Accordingly, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release or a sentence reduction on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies. Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Although this requirement is said to be mandatory, the Fifth Circuit has treated it as "a nonjurisdictional claim-processing rule." *Franco*, 973 F.3d at 468. "Mandatory but nonjurisdictional procedural filing requirements may be waived." *United States v. McLean*, Nos. 21-40015, 21-40017, 2022 WL 44618, at *1 (5th Cir. Jan. 5, 2022); *see United States v. Harden*, No. 4:11-CR-127-SDJ, 2025 WL 562716, at *5 (E.D. Tex. Feb. 20, 2025). Therefore, if the Government fails to "invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief," that argument is deemed waived. *McLean*, 2022 WL 44618, at *1.

A defendant's motion for compassionate release must be based on the same circumstances as those raised in his request for release to the warden of the facility where he is housed. *United*

11

*States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion"); *accord United States v. Thomas*, No. 4:19-CR-28-SDJ, 2023 WL 5279457, at *5 (E.D. Tex. Aug. 16, 2023) (citing *United States v. Mendoza-Garibay*, No. 4:13-CR-00281, 2023 WL 307459, at *1 (E.D. Tex. Jan. 18, 2023)). Hence, the facts asserted in an inmate's request to the warden and in his motion for compassionate release must be consistent. *United States v. Scott*, No. CR 17-114, 2024 WL 2187849, at *2 (E.D. La. May 14, 2024); *see United States v. Gonzalez*, 849 F. App'x 116, 117 (5th Cir. 2021). Further, "the exhaustion requirement applies to new arguments or grounds for compassionate release developed after an earlier request for compassionate release." *United States v. Cantu*, No. 7:17-cr-01046-2, 2022 WL 90853, at *1 (S.D. Tex. Jan. 5, 2022) (citing *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020)); *accord Mendoza-Garibay*, 2023 WL 307459, at *2.

Here, the Government invokes § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief. The court is without authority to waive the exhaustion of administrative remedies or the 30-day waiting period. *Franco*, 973 F.3d at 468 ("Congress has commanded that a 'court *may not* modify a term of imprisonment' if a defendant has not filed a request with the BOP."); *see United States v. Harper*, No. 24-30275, 2024 WL 4664018, at *1 (5th Cir. Nov. 4, 2024) ("[B]ecause the Government properly raised the rule requiring exhaustion in the district court, "the court *must* enforce the rule."); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) ("[B]ecause this exhaustion requirement serves valuable purposes (there is no other way to ensure an orderly processing of applications for early release) and because it is mandatory (there is no

exception for some compassionate-release requests over others), we must enforce it."); *United States v. Gomez*, No. 2:17-cr-41-KS-MTP, 2025 WL 420531, at *2 (S.D. Miss. Feb. 6, 2025) ("Congress used clear language: all requests for compassionate release must be presented to the [BOP] before they are litigated in the federal courts."); *United States v. York*, No. 17-00086-BAJ-RLB, 2024 WL 3771442, at *3 (M.D. La. Aug. 13, 2024) (recognizing that a court may not modify a term of imprisonment if a defendant has not filed a request with the BOP); *United States v. Garcia*, No. CR 2:18-1337, 2020 WL 3000528, at *3 (S.D. Tex. June 2, 2020) ("While the Court sympathizes with Defendant's plight, because he has failed to comply with the exhaustion requirements under § 3582, his motion is not ripe for review, and the Court is without jurisdiction to grant it."); *see also Ross v. Blake*, 578 U.S. 632, 639 (2016) ("[J]udge-made exhaustion doctrines . . . remain amenable to judge-made exceptions," whereas "mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion.").

Here, Johnson appears to have exhausted his administrative remedies only in part.  He submitted to the court a copy of an email dated November 7, 2024, addressed to BTF/Social Worker that also states "To: Mr. Jones," with the Subject listed as "Request to Staff," which reads:

Dear Mr. Jones:

I previously had written to you requesting to file another "Compassionate Release" with the current Warden at this facility.  Therefore, I am giving you a little information that can be submitted in that request as follows:

1.      I transferred from USP Hazelton, West Virginia, to the Federal Medical Center (FMC) Butner on January 19, 2022.  At that time I was classified as a care level IV (4) individual in need of two chemotherapy treatments for reoccurring Bladder tumors since 2004.  I saw the physician on January 24, 2022, who was

awaiting an in-house urology consultation but presumed I would be scheduled for six (6) installations of Bacillus Calmette-Guerin via cystoscopy.

2.      However, due to me filling [sic] an injury tort claim against my PA, and other staff.  My care level was decreased by this provider in June of 2022 to a care level III (3).  Then I was transferred to FCI-2, without ever having the much needed six (6) months installations of Bacillus Calmett-Guerin treatments.

3.      Furthermore, since being at the FCI-2 Facility my health has went down to where to where I nearly died at Duke University Cancer Center September 26, 2024.  I have become a diabetic, got high blood pressure, high cholesterol, glaucoma, blood clots and my low grade bladder cancer had metastasized to my left kidney since my care level was decreased.

4.      I had surgery at Duke University Cancer Center on September 23, 2024, where my kidney, ureter and a portion of my bladder had to be removed.  Thereafter, I had to have chemotherapy administered, which dropped blood pressure to 60 over 20 and nearly killed me.

5.      The pathology report on the kidney that was removed the cancer also came back low grade.  The doctor was shocked, because he never seen a case like mines [sic] before, because he was certain that the center of the kidney would come back high grade cancer.

6.      I was told that all the delayed medical treatments over the years was the cause to my current medical condition.

7.      I am now having difficulties with my liver.

        Mr. Jones I am running out of time on the computer, but for further information please review my medical files.

On February 26, 2024, L.B. Kelly, Warden of FCI Butner II, North Carolina, responded

to Johnson's request for a reduction in sentence.  Warden Kelly states:

This memorandum is in response to your request to staff dated January 17, 2024, in which you requested to be considered for a reduction in sentence under medical conditions criteria.

At this time, you do not meet the guidelines outlined in Program Statement 5050.50, Compassionate Release/Reduction in Sentence:  Procedures for Implementation of 18 U.S.C. 3582 (c)(1)(A) and 4205(g), Section 3a., Terminal

14

Medical Condition, Section 3b., Debilitated Medical Condition and Section 4b.,
Elderly with Medical Conditions.  You do not have a terminal illness, with a life
expectancy of less than 18 months and you are independent with your self-care.
You do not have a debilitated medical condition and you are independent of your
activities of daily living and your current medical conditions remain under control.
Also, you do not meet age under elderly with medical conditions criteria.
Accordingly, your RIS request is denied at this time.

At present, you are receiving appropriate medical care and treatment by Health
Services staff.  We are committed to providing you with the necessary and
appropriate care for your medical needs.

If you are not satisfied with this response to your request, you may commence an
appeal of this decision via the administrative remedy process by submitting your
concerns on the appropriate form (BP-9) within 20 days of the receipt of this
response.

There is no indication in the file that Johnson commenced an appeal of the warden's decision via
the administrative remedy process.

Thus, in this instance, Johnson has exhausted his administrative remedies only with respect
to his claims regarding metastatic bladder cancer, diabetes mellitus (Type II), and the quality of
medical care in prison.  He did not raise any claims to the warden based on his age, the length of
his sentence, changes in the law, unusually harsh prison conditions, programming, the "catchall
provision" of U.S.S.G. § 1B1.13(b)(5), rehabilitation, end-of-life medical issues, obesity, hiatal
hernia, use of a walker, vertigo, cataracts, or no longer posing a danger to society.   In his
response, Warden Kelly addressed Sections 3a (Terminal Medical Condition) and 3b (Debilitated
Medical Condition) of Program Statement 5050.50.  The warden also referenced Section 4b of
Program Statement 5050.50 (Elderly with Medical Conditions), which applies only to inmates age
65 and older and generally corresponds to U.S.S.G. § 1B1.13(b)(2), clarifying that extraordinary
and compelling reasons exist as to a defendant's age when:

AGE OF THE DEFENDANT.—The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

Johnson is ineligible for relief under this provision because he is just 60 years of age.

Therefore, Johnson has exhausted his administrative remedies only with respect to a small portion of his claims. Moreover, while Johnson may have complied with the exhaustion requirement, at least in part, before filing his motion for compassionate release, nothing in the motion indicates that extraordinary and compelling reasons exist to reduce his sentence or release him from confinement at this time.

C.     Criteria for Compassionate Release or Sentence Reduction

With respect to a defendant's medical circumstances, §§ 1B1.13(b)(1)(A), (B), and (C) of the United States Sentencing Guidelines state that extraordinary and compelling reasons exist if the defendant's motion presents the following circumstances:

(A)     The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

U.S.S.G. § 1B1.13(b)(1)(A).

(B)     The defendant is—

(i)     suffering from a serious physical or medical condition,

(ii)     suffering from a serious functional or cognitive impairment, or

(iii)     experiencing deteriorating physical or mental health because of the aging process,

16

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B).

(C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(C).

D.    Medical Conditions at Issue

1.    Bladder Cancer

Johnson was first diagnosed with bladder cancer in 2004, well before he committed his offense of conviction in March 2012.  After initially receiving treatment in 2004, his Presentence Investigation Report ("PSR") reflects that he was treated again in 2006, 2008, and 2010.  His prognosis was reportedly good in 2012.  Johnson's BOP medical records reveal that his bladder cancer has been actively monitored and treated over the years while he has been confined in federal prison.  In recent years, Johnson was seen by Adrian Ogle, M.D. ("Dr. Ogle"), a board-certified urologist, who noted that a CT scan of his abdomen and pelvis on November 6, 2023, "showed dilation of left renal pelvis, collecting system, and renal pelvis with abnormal soft tissue attenuation."  Dr. Ogle also commented that Johnson had a urine cytology test on December 29, 2023, that was "atypical."   On March 8, 2024, Johnson consulted with Dr. Ogle after a surveillance cystoscopy was performed the same day which revealed a "small papillary lesion right floor."  Dr. Ogle ordered an MRI of Johnson's abdomen with and without contrast, which was conducted at Duke Regional Hospital on July 1, 2024.

Biopsies of Johnson's bladder and left renal pelvis were performed in July 2024 revealing "noninvasive papillary urothelial cell carcinoma, low-grade."  On July 26, 2024, Dr. Ogle determined that further intervention was needed for Johnson's "now transitional cell carcinoma, low-grade left renal pelvis, and history of low-grade noninvasive bladder cancer."  Dr. Ogle recommended for him "to be referred to a tertiary care center as soon as possible for further treatment."  Shortly thereafter, on August 7, 2024, Johnson consulted with Ankeet Shah, M.D. ("Dr. Shah"), a board certified urologic oncologist at the Duke Cancer Center.  A PET/CT scan performed on August 2, 2024, had disclosed "no evidence of metastatic disease."  Dr. Shah discussed with Johnson the various treatment options for the malignancies in his bladder and left renal pelvis.  The medical team determined that the most appropriate treatment option was a nephroureterectomy—the removal of the left kidney, ureter, and bladder cuff.  The procedure was performed at Duke University Hospital on September 23, 2024.  The medical records reflect that Johnson "tolerated the procedure well and was taken to the stepdown unit, and admitted to the Urology service in stable condition."  At some point, however, he "because very hypotensive (60s/40s) and a rapid response was called."  His vitals later returned to normal.  On September 28, 2024, Johnson "was found to be neutropenic," a condition in which a person has an abnormally low number of neutrophils, a type of white blood cell, which is a common side effect of chemotherapy treatment.  The medical staff at the hospital concluded that Johnson's hypotensive condition was a "rare systemic reaction" to a chemotherapy drug (gemcitabine) that had been administered into his bladder.  Johnson "stabilized prior to discharge" and the "rest of his post operative course was as expected and uneventful."  He was discharged from the hospital on October 2, 2024, and returned to his prison unit.

18

A surveillance cystoscopy performed on January 3, 2025, showed "No recurrence." On January 14, 2025, a CT scan conducted on January 14, 2025, contained "finding suspicious for recurrence and/or metastatic disease in the surgical bed in the left retroperitoneal region." Medical notes remarked that those "findings can be further evaluated with PET imaging to ascertain or confirm these findings." A PET/CT scan performed on March 6, 2025, reflected "[n]o suspicious hypermetabolic activity" and noted that Johnson had a "[g]ood response to therapy." A physician noted that the "PET scan was reassuring as it did not show any uptake." On May 13, 2025, a report of a Cytology urine test stated: " NO MALIGNANT CELLS IDENTIFIED. Negative for high grade urothelial carcinoma." On May 16, 2025, Johnson was seen by the Urology Department for another "routine surveillance cystoscopy in setting of prior low grade bladder cancer." The cystoscopy showed "[n]o recurrence" of bladder cancer and "no lesions or concerning findings." On May 18, 2025, Johnson complained of abdominal pain and urgency and frequency of urination, but he refused the placement of a catheter to measure urine output, and he went back to his housing unit. On June 3, 2025, Johnson had another checkup that was unremarkable, and a follow-up surveillance cystoscopy was scheduled for December 5, 2025. Johnson's medical records reflect that he is prescribed and receives a variety of medications to treat his bladder cancer and accompanying symptoms, including oxybutynin, phenazopyridine, tamsulosin, sulfamethoxazole, nitrofantonin, and gabapentin, as well as ondansetron to prevent nausea caused by cancer treatments.

2.     Diabetes

Johnson's medical records confirm that he has been diagnosed with Type 2 diabetes mellitus. A medical record dated April 22, 2025, reflects that his diabetes is "controlled on

19

ozempic." His current list of medications includes semaglutide, the generic name for Ozempic, metformin, as well as glucose gel and glucose tablets, all prescribed to treat diabetes. He has been issued a glucose monitor to help regulate his blood sugar level. Johnson also participates in chronic care clinics, including one for diabetes. A medical record dated April 22, 2025, indicates that Johnson's chronic kidney disease is "overall very mild and stable." His end stage renal disease risk is "very, very low at this point. He has well-controlled risk factors." The record further states, "I would check labs at least every 6 months with a renal function panel, a urine albumin creatine ratio, and an A1C. We can follow up once a year at this point." The same medical record reflects that Johnson's hypertension [high blood pressure] is "well controlled on current therapy." His medication list includes lisinopril and doxazosin, both of which are prescribed to treat hypertension. Johnson's prescription for semaglutide also has beneficial effects regarding his obesity. In addition to these medications, Johnson is prescribed lactulose to treat his hernia, meclizine for dizziness, apixaban to treat embolism, venal thrombosis, and blood clots, and atorvastatin for high cholesterol.

3.     Quality of Medical Care in Prison

Contrary to his current contentions, Johnson's extensive medical records over the years reflect that he has regularly been provided ample medical care by a variety of qualified providers who are consistently responsive to his litany of concerns. He is seen regularly by providers at specialized clinics maintained at FCI Butner, has access to the nearby Federal Medical Center, has consultations with board-certified specialists, and is administered a plethora of prescription medications for his various ailments. He also receives treatment and testing at Duke University Hospital, a top-tier, academic medical center that is consistently ranked among the best hospitals

20

in the United States by *U.S. News & World Report* and *Newsweek*.  Although he may have experienced a rare adverse reaction to a medication at the facility on one occasion, the problem was quickly rectified and he recovered shortly thereafter.  Indeed, the overall quality of the medical care readily available and furnished to Johnson appears to be superior to that available to most of the free-world population in the United States.

Hence, Johnson's myriad medical complaints provide no basis for compassionate release. He is not suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory).  *See* U.S.S.G. § 1B1.13(b)(1)(A). Although Johnson's recurrent bladder cancer has caused him some difficulties, both in and out of prison, he has received appropriate and effective treatment while incarcerated, and currently there is no indication that the condition has returned after the nephroureterectomy was performed in 2024.  As the Government points out, one study of 422 people who had a radical nephroureterectomy to treat urothelial cancer showed that the five-year survival rate is over 70% and the 10-year survival rate is over 67%. https://my.clevelandclinicorg/health/treatments/17164-nephrouretorectomy.  This is consistent with the warden's statement that Johnson does "not have a terminal illness, with a life expectancy of less than 18 months."  According to BOP records, Johnson's projected release date is December 27, 2030, five years from now.

Johnson also is not suffering from a serious physical or medical condition that substantially diminishes his ability to provide self-care within the environment of a correctional facility.  *See* U.S.S.G. § 1B1.13(b)(1)(B).  Johnson is classified as a BOP Medical Care Level 3 inmate. According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 3 inmates "are outpatients who have complex, and usually chronic, medical[,] or mental health conditions and

who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions. Stabilization of medical or mental health conditions may require periodic hospitalization." While some of Johnson's conditions may require specialized medical care, they do not substantially diminish his ability to provide self-care in the prison setting and do not limit his activities of daily living. Johnson's inmate profile, contained in the BOP records, reveals that he is housed in general population, is ambulatory, has no medical restrictions, has regular duty work assignments, is cleared for food service, and has a current work assignment in assembly in the UNICOR prison industry. He has been issued a 4-wheel walker and medical shoes. In a medical record dated March 28, 2025, Romin Bonakdar, M.D., reported that Johnson related, "Overall, he feels pretty good. He says he works five days a week." Moreover, as discussed above, Johnson is not suffering from a medical condition that requires long-term or specialized medical care that is not being provided. *See* U.S.S.G. § 1B1.13(b)(1)(C). In fact, most of his medical conditions are commonplace and are well managed with a variety of medications and monitoring. When more advanced medical care is required, it is being supplied by a host of physicians, specialists, and other treatment providers. Under the circumstances, Johnson's current medical conditions present no "extraordinary and compelling" reason warranting a sentence reduction or compassionate release.

      E.   <u>Section 3553(a) Factors</u>

Moreover, as the court concluded in its prior orders, compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United*

*States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). Section 3553(a)(1) requires the court to consider the nature and circumstances of the defendant's offense of conviction as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Here, neither the nature of Johnson's offense nor his history and characteristics warrant a sentence reduction.

Johnson's offense of conviction entails his commission of carjacking and sexual assault after he stalked and harassed the female victim whom he had previously dated for several months.

As Probation recounts in a report dated June 4, 2025:

The presentence report reflects that the victim in this case ended a romantic relationship with Mr. Johnson in December 2011. He also immediately began stalking her outside her home and in her backyard. He was also going to her place of employment and calling and texting her frequently. Mr. Johnson was warned by law enforcement to stay away from the victim. Between December 18, 2011, and January 16, 2012, the victim called law enforcement ten times regarding harassment by him. The victim installed a video surveillance unit for the exterior of her home and on January 28, 2012, Mr. Johnson was seen in her backyard with a flashlight looking around and attempting to enter her garage. She called the police and Mr. Johnson was located a block from her home. He was arrested and charged with Third Degree Stalking and an Emergency Protective Order was issued.

On March 12, 2012, the victim arrived at her place of employment and was forced back into her car at gunpoint by Mr. Johnson. He had her call her employer and state she would not be coming to work that day. He drove her to a nearby parking lot and forced her into his car so they could drive to his apartment. Once at his apartment, the victim was locked inside, and Mr. Johnson went through her phone history while accusing her of having sexual relations with other men. He then

made her call the district attorney's office and state she wanted to drop all charges against him. Mr. Johnson had the victim agree that she still loved him, and they could stay together. He then asked several times to have sex, and she finally agreed when he started getting angry stating she feared for her life. Mr. Johnson also made the victim call his mother and tell her they were staying together and that all charges against him had been dismissed. He finally took the victim back to her car and let her go home. Mr. Johnson was arrested on March 27, 2012, and a loaded revolver was found in the backseat of his car during a search.

On April 4, 2013, federal investigators were made aware of three outgoing letters written by Mr. Johnson while in the Collin County Jail that had been intercepted. These letters outlined a plot to have a family member send a firearm through the United States mail to a fellow inmate who was to use the firearm to kill the victim of the carjacking offense. The first letter was dated March 28, 2013, and asked the individual to provide a firearm. The second letter was dated March 29, 2013, and directed another individual believed to be Mr. Johnson's cousin to mail the firearm to James Franklin. The letter states, "Just get that to him and no witness, no case at trial". This letter also discusses the fact that Mr. Johnson had a new charge from an incident where he was caught in possession of a shank or knife-like weapon while currently incarcerated. The third letter intercepted talked to another individual about the plan Mr. Johnson had made to make his charges go away. On Thursday, April 4, 2013, Mr. Johnson was confronted about the three letters and admitted that he wrote them.

Johnson has an extensive criminal history beginning in his youth, which includes prior juvenile convictions for sexual assault (in which he admitted he was the "designated rapist" among 3 boys), breaking and entering occupied dwelling (2x), and grand theft auto, and prior adult convictions for burglary, larceny from a person, armed robbery, aggravated stalking, malicious destruction of building, aggravated kidnapping with intent to commit sexual abuse, violation of a protective order involving aggravated assault and bias, and possession of a deadly weapon in a penal institution. Johnson also failed to comply with a previous term of probation. Like the prisoner in *United States v. Jones*, Johnson is "the quintessential career offender." 852 F. App'x 60, 61 (3d Cir. 2021). He has a long history of criminal behavior since he was a juvenile, in both Michigan and Texas, "with most gaps in that behavior occurring only during times of

24

incarceration." *Id*. at 61-62.  In short, Johnson's "criminal history and conduct reflect an unabated propensity for crime." *United States v. Padilla*, No. H-14-174-1, 2021 WL 1517855, at *5 (S.D. Tex. Apr. 16, 2021).

Although Johnson has expressed a desire to be released to the home of his mother, "Jerdline" Caston, the PSR reflects that her name is actually Geraldine Caston ("Caston"), as confirmed by a letter she submitted to the court in support of Johnson's request for compassionate release.  The PSR indicates that he was raised by Caston in Michigan with the help of her parents. Johnson lived in Michigan until 2008, where he accumulated all of his juvenile convictions as well as his burglary, larceny from a person, armed robbery (repeat offender), aggravated stalking, and malicious destruction of building convictions.  Hence, Caston was unable to prevent Johnson from engaging in serious criminal conduct while he was growing up and under her supervision as a young man.  She is now in her 80's and resides in an apartment in Novi, Michigan.  There is no reason to believe that Caston could now deter Johnson from continuing to engage in criminal activity, including crimes of violence, if he were released from confinement at this time and began serving his 5-year term of supervised release.  Probation reports, however, that according to the Texas Department of Criminal Justice ("TDCJ"), Johnson:

> also has a detainer/bench warrant for the 2012 convictions of Aggravated Kidnapping with Intent to Commit Sexual Abuse, a 1st Degree Felony, Habitual Offender; and Violation of a Protective Order Involving Aggravated Assault and Bias with Two Prior Convictions.  He was sentenced to 60 years confinement for each offense.  TDCJ records currently show that he has a projected release date of March 21, 2072, and a parole eligibility date of March 21, 2042.

"[C]ompassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see*

25

*Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, but deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when the district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting the defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal").

In *United States v. McKinney*, the court denied relief to a prisoner who had end-stage renal failure and had a portion of his foot amputated despite the Government's concession that the defendant had established an "extraordinary and compelling reason" within the meaning of § 3582(c)(1)(A)(i), finding that "granting compassionate release would not comport with the factors enumerated in Section 3553(a)." No. 19-00394-03, 2023 WL 2993020, at *1, 3 (W.D. La. Apr. 18, 2023). The court pointed to McKinney's extensive criminal history that included several drug convictions, firearm convictions, and simple battery. *Id*. at *3. The *McKinney* court

noted that the inmate had repeatedly failed to comply with previous terms of probation and parole and clearly lacked respect for the law. *Id.* The court concluded that a reduction in sentence would not equate to a "just punishment" under § 3553(a)(2)(A). The court expounded: "It is this court's belief that a reduced sentence simply would not reflect the seriousness of the offense, would not promote respect for the law, would not afford adequate deterrence to criminal conduct, and would not protect the public from further crimes of this Defendant." *Id.* This court has the same belief in the case at bar. As Johnson's probation officer commented in the report, "[E]very time Mr. Johnson has been arrested there was violence involved and he could be considered a danger to the community." Clearly, Johnson's long-standing affliction with bladder cancer since 2004 did not hamper or prevent him from committing his offense of conviction or his state offenses of aggravated kidnapping with intent to commit sexual abuse, violation of a protective order involving aggravated assault and bias with two prior convictions, and possession of a deadly weapon in a penal institution in 2012. *See Rollins*, 53 F.4th at 360 (noting that the defendant "had committed serious crimes while suffering from severe and life-threatening medical complications"). In view of the nature and circumstances of his offense of conviction and his extensive criminal history, the court cannot conclude that Johnson's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole. As in *McKinney*, the § 3553(a) factors do not support Johnson's release.

On balance, compassionate release is not warranted in this case in light of the applicable factors set forth in § 3553(a). As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he has behaved when released in

the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Johnson's track record is abysmal. In this instance, there is no reason to believe that Johnson would not revert to his prior acts of violence including armed robbery, carjacking, and aggravated kidnapping, as well as his possession of firearms, if released from prison at this juncture. *See United States v. Wymer*, 573 F. Supp. 3d 1208, 1212 (N.D. Ohio 2021). Here, Johnson's past behavior and his refusal to recognize the wrongfulness of his actions through his repeated frivolous filings with the court seeking to set aside his conviction and/or reduce his sentence give grave cause for concern as to his future conduct. Like the court in *United States v. Lewis*, this court concludes that "Defendant's current term of imprisonment was and remains appropriate." No. 17-CR-28-FPG, 2021 WL 4519795, at *3 (W.D.N.Y. Oct. 4, 2021). Johnson committed a serious offense that justified his sentence, and the circumstances he now identifies do not render that sentence unjust or inequitable. *See id.*

After thoroughly reviewing Johnson's case, Probation concluded in its June 4, 2025, report:

> In summary, it is believed the Bureau of Prison[s] is doing their best to appropriately screen any inmate they believe should be removed from custody and placed on home confinement. It is believed Bureau of Prison[s] case management staff and medical staff are in the best position to consider Mr. Johnson's status as it relates to the appropriateness of compassionate release. Mr. Johnson's extensive history of violent and sexual offenses is concerning, and the U.S. Probation Office is of the opinion that the current imprisonment sentence should be served. As such, we respectfully recommend the motion for compassionate release filed on May 21, 2025, be denied.

III.  Conclusion

The court concurs with Probation's assessment of the situation.  Johnson has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.  The 240-month sentence of imprisonment imposed upon Johnson for his carjacking offense comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or justify his release from prison at this time.  Neither his health, his age, nor the length of his incarceration merits a reduction of sentence under these circumstances.

In accordance with the foregoing analysis, Johnson's Emergency Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (#194) is DENIED.

SIGNED at Beaumont, Texas, this 18th day of December, 2025.


_Marcia A. Crone_
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE